Jane H. GOLDMAN and Allan Howard Goldman, as Executors Under the Last Will and Testament of Sol Goldman, Deceased, Plaintiffs,

v.

Robert BURCH, Individually and as Trustee Under Trust Known as GC–1 Trust, Defendant.

87 Civ. 7189 (BN).

United States District Court, S.D. New York.

Nov. 25, 1991.

Stephen H. Penn & Associates, Noel W. Hauser, New York City, for plaintiffs.

Gibson, Dunn & Crutcher, Mitchell A. Karlan, New York City, for defendant.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge, United States Court of International Trade, sitting as a United States District Court Judge by Designation:

### INTRODUCTION

This diversity action, 28 U.S.C. § 1332(a), presents complex issues of contract interpretation relating to the sale of the Dorset Hotel operations ("Hotel") in New York City.

Plaintiffs, citizens of the State of New York and executors of the Sol Goldman estate, seek recovery of $807,621.81 as the amount allegedly overpaid by the decedent ("Goldman") to defendant, Robert D. Burch ("Burch"), a citizen of the State of California and Trustee of the GC–1 Trust ("Trust"), under a Purchase Agreement executed on April 9, 1987 ("Agreement") and a First Amendment to Purchase Agreement pertaining to the Dorset Hotel Operations ("Amendment").

Defendant, seller of the Hotel on behalf of the Trust, counterclaims for damages in the sum of $419,179.76 for alleged breaches by Goldman of the Agreement and Amendment relating primarily to various post-closing adjustments and prorations. The building and land of the Hotel, owned by other trusts of which Burch was the trustee, were covered by separate transactions that closed on or about May 15, 1987 and are not in issue. Hence, only the contracts relating to the Hotel operations as a "going business" are in dispute.

On March 23, 1990 Judge Miriam G. Cedarbaum granted Burch's motion for summary judgment in his individual capacity, but denied such motion as trustee on the ground there is a genuine issue of disputed fact with respect to the intent of the parties to the contracts. For Judge Cedarbaum's oral opinion, see record of proceedings, Tr. of March 23, 1990 hearing, at 24, 38–9).

On November 9, 1990 this action was reassigned to the writer for purposes of trial. A bench trial was held on January 23–24 and May 20–22, 1991. At the conclusion of trial, decision was reserved. Filing of posttrial submissions by the parties was completed in late August 1991. Findings of fact and conclusions of law in compliance with Fed.R.Civ.P. 52(a) follow.

### FINDINGS OF FACT

1. Burch, a lawyer for over 35 years, is a partner in the law firm of Gibson, Dunn & Crutcher. He specializes in trust law and acts as trustee of 33 trusts having aggregate net assets in excess of $500,000,-000.

2. Sol Goldman died in 1987 after the transactions at issue. He was one of the country's most successful real estate investors whose extensive New York City holdings are well known. The original purchaser of the hotel under the Agreement and Goldman's predecessor in interest was a New York corporation wholly owned and controlled by Goldman known as GSL Enterprises, Inc.

3. Excluding attached exhibits and an index, the Agreement is 48 pages in length, complex and highly sophisticated. The Amendment is fourteen pages, modifies certain provisions of the Agreement and adds new provisions. Both documents were preceded by several preliminary drafts carefully thought out and reviewed by attorneys on both sides. Goldman was represented and advised in the contract negotiations by a longtime experienced attorney, Edward Breger, Esq., who testified at trial on behalf of plaintiffs. Moreover, before the parties executed the Agreement, Goldman's representatives spent several days at the Hotel examining the books and records and communicating with Ms. Gonzaga Woods, the president of the Hotel's

managing agent, Bing & Bing Management, Inc. ("B & B"). An outstanding $2 million loan from Dr. Peter Bing ("Bing") to the Hotel was reflected in the Hotel's financial statement, books and records.

4. The total price for the entire deal—the Hotel's land, building and operations—was approximately $77 million: $72 million for the land and building; and approximately $5 million for the Hotel operations as a going business.

5. The Agreement stipulated that the closing take place on April 30, 1987, that time was of the essence, but Goldman could adjourn the closing for reasonable cause—no later than May 7, 1987 (§ 4.01). However, as discussed *infra,* closing did not occur on that date and the parties entered into the Amendment, of which § 2 is pivotal to the present controversy.

6. The Hotel sold liquor under a license issued to Burch. The Agreement provided that Goldman would promptly apply for a license. However, the Agreement further stipulated that if Goldman had not received a license by the closing date, he would, with certain stipulations relating to reservation of title to the liquor in the seller, an escrow account for liquor revenues, an indemnifcation agreement protecting Burch from liability, and other conditions and restrictions for Burch's legal protection, operate the Hotel after closing and sell liquor utilizing Burch's license.

7. Further, the parties stipulated in § 6.02(1)(vi) of the Agreement, that if prior to closing, either party reasonably determined that the arrangement for the sale of liquor by Goldman under Burch's license violated the law, (a) the parties would not be bound by the original arrangement and would attempt in good faith to agree upon an alternative arrangement for the sale of liquor in a lawful manner, and (b) neither party would be *obligated* to agree to any arrangement that would be less advantageous to it, economically or otherwise, than the arrangement initially agreed upon.

8. Subsequently, counsel for both parties advised their respective clients that the legality of the arrangement in the Agreement for Goldman to sell liquor in the Hotel after closing using Burch's license was dubious. Following the advice of his liquor counsel, Burch decided he would not follow the questionable arrangement he had agreed upon with Goldman in the Agreement involving lending Goldman his liquor license.

9. Goldman was unable to obtain a liquor license for the Hotel by May 7, 1987, the last possible closing date under the Agreement, and the closing for the Hotel operation did not take place by the deadline. The transactions involving the Hotel's land and building closed as scheduled on or about May 15, 1987.

10. Pursuing the "escape clause" in § 6.01(1)(vi) of the Agreement regarding liquor sales, Goldman and Burch reached an agreement on an alternative arrangement, and they entered into the Amendment on May 8, 1987. The impetus for the Amendment, as expressed in RECITAL B was to remedy potential legal problems regarding the provisions of the Agreement of April 9, 1987 for continued sale of liquor at the Hotel under Burch's license following the closing until Goldman could obtain his own license (§ 6.02(1)(i) through (v)).

11. The Amendment provided for extension of the closing date on the Hotel Operations to no later than September 30, 1987 (whether or not Goldman had obtained a license), continued ownership and management of the Hotel operations by the Trust in the interim (a so-called "Seller Management Period") and the sale of liquor under Burch's license and retention by the Trust of cash receipts from liquor sales until closing.

12. The sale of the Hotel operations closed on September 30, 1987, and hence the Seller Management Period ran from May 15 to September 30, 1987.

13. Goldman understood that pursuant to the Amendment, the *Trust* would continue to have the ownership, management and sole control of the Hotel's operations during the Seller Management Period (May 16, 1987 to September 30, 1987); that the Trust would continue to manage and operate the Hotel in the same manner as prior to the Seller Management Period; that the Trust would retain the working capital on hand, and Goldman would advance additional working capital if requested to do so by the Trust. Moreover, Goldman agreed he would pay the Trust in addition to the $5 million purchase price, 10% of such price per annum from May 7, 1987 (final date for closing under the April 9th Agreement) until the actual closing date (not later than September 30, 1987). The ten percent increase was solely compensation to the

Trust for delay in receiving and reinvesting the purchase price funds.

14. The Amendment further stipulated in § 2 that to the extent the Trust retained the net cash on hand of the Hotel as of September 30, 1987, the purchase price of the Hotel operations was to be decreased by the "Net Profits" of the Hotel during the Seller Management Period. The parties defined "Net Profits" as "the difference between cash receipts (other than those retained by Seller [the Trust] pursuant to Section 7(a) below) and cash disbursements * * * "; "Net Profits" also excluded recognition of any cash receipts from the sale of alcoholic beverages and cash expenses relating to the purchase of alcoholic beverage inventory for the Hotel to the extent such expenses were paid out of cash receipts from the sale of alcoholic beverages.

15. As required by the Amendment, on May 15, 1987 Goldman furnished Burch with a letter of credit in the amount of $5.2 million as security for payment of the purchase price. The figure of $5.2 million assumed a closing date no later than September 30, 1987 and that there would be no "Net Profits" during the Seller Management Period.

16. Under § 6 of the Amendment, the parties agreed that during the Seller Management Period, the Trust and B & B would have exclusive control over the operations and management of the Hotel, even if Goldman objected to the Trust's management decisions, with the proviso that the Trust would "continue operating the Hotel in a manner substantially consistent with the Seller's past practices." In the event that Goldman became dissatisfied with the management of the Hotel by the seller, Goldman's sole remedy was to assume management under the terms of the Amendment. By agreeing to accommodate Goldman under the Amendment, Burch intended that the Trust receive an economic benefit from its continuing to own and manage the Hotel operations during the Seller Management Period.

17. Prior to the Amendment on May 8, 1987, and during the Seller Management Period, the Hotel's books and records were fully available to Goldman for examination, and these records were periodically reviewed by Goldman's representatives. When negotiating the Amendment, Goldman and his lawyer, as well as Burch, were well aware from examination of the Hotel's records that the Hotel as an ongoing business had been accruing expenses and accounts payable for purchases of supplies and services prior to May 16, 1987 for which the Hotel would be billed and required to pay for on and after May 16, 1987. The financial statement for the Hotel as of May 15, 1987 shows accounts payable for goods and services purchased prior to May 16, 1987 of $7,669.61. Neither Goldman nor Breger specifically requested a schedule of these accounts payable and defendant did not furnish one for the reason that the Trust agreed to pay its creditors (Agreement § 5.03) and compliance with the "bulk sale" provisions of the New York Uniform Commercial Code were waived by Goldman (Agreement, § 6.02(d)). The records also reflected a $2 million note payable to Dr. Bing predating the Amendment. Interest payments on the Bing note were a cost of operation of the Hotel reflected on the profit and loss statement.

18. As had been his past practice prior to May 16, 1987, during the Seller Management Period Burch continued to pay all bills received by the Hotel and all of its expenses out of Hotel revenues. Burch viewed the Trust's right to use Seller Management Period revenues to pay expenses accrued before the Period as consideration to the Trust for entering into the Amendment.

19. Goldman's representative, Paul Underhill, was present at the Hotel during the Seller Management Period and specifically questioned Burch in June 1987 concerning the Trust's practice of paying bills received for expenses accruing prior to May 16, 1987, out of Hotel revenues. Burch insisted that under the Amendment, he was entitled to pay all bills presented for payment during the Seller Management Period out of Hotel revenues, and referred Underhill to Goldman's attorney, Breger. Thereafter, there was no further discussion of the matter between Underhill and Burch, and no inquiry concerning the matter by Breger.

20. When negotiating the Amendment, Breger discussed with Burch employing cash basis accounting from May 15, 1987 to September 30, 1987, i.e., "the accounting for all of the receipts and disbursements" (Breger, Tr. 43). On a cash basis, there was a deficit of $88,313.65 in the Hotel's operations for the period of May 16, 1987

through September 30, 1987. There is no provision in the Amendment for indemnifying the Trust for an operational cash deficit for the Seller Management Period.

21. Testimony adduced by plaintiffs that prior to or at the time of executing the Amendment Goldman and Breger intended or believed that under § 2, the Trust was barred from paying bills for expenses accruing prior to May 16, 1987 out of Hotel revenues during the Seller Management Period was not credible. The only credible testimony concerning the latter is that neither Goldman nor Burch had such intent.

22. Under § 5.01 of the Agreement of April 9, 1987, the Trust agreed to discharge outstanding accounts payable after closing; until closing, the Trust obviously had the right to pay accounts payable out of Hotel revenues. The Amendment extended the closing date and provided an interim Seller Management arrangement, but contains no modification of the Trust's obligation under § 5.03, regarding discharge of accounts payable. Moreover, Under § 6 of the Amendment, the Trust agreed "to continue operating the Hotel in a manner substantially consistent with Seller's past practices." Prior to the Amendment, the Trust discharged accounts payable out of Hotel revenues. During the Seller Management Period, the Trust discharged accounts payable out of Hotel revenues, whether the expenses accrued prior to or after May 16, 1987, and continued cash basis accounting.

23. Goldman did not supply working capital *that was available to or used by the Hotel.*

24. Pursuant to § 7(d) of the Amendment, during the Seller Management Period the Trust advanced working capital in the sum of $500,000 (by wire transfer), which must be reimbursed to the Trust with interest; $382,122.40 of the $500,000 advance was repaid to the Trust; a balance of $132,387.73 (which includes accrued interest) is due the Trust.

25. Pursuant to § 7(a) the Trust was entitled to receive accounts receivable that existed as of May 15, 1987. Exhibit 32, a check to Burch in the sum of $40,402.40, was a payment for accounts receivable as of May 15, 1987.

26. Certain deposits paid by the Trust prior to May 16, 1987 were refunded to Goldman after the closing date, September 30, 1987, in the aggregate sum of $17,810.45: American Telephone and Telegraph refund of $13,558.03, a T.V. refund of $3,000 and a water bill refund of $1,252. Plaintiffs concede the Trust is entitled to recover those refunds.

27. The Trust concedes there was an excess payment by Goldman to the Trust of $10,958.90 resulting from the difference between the proceeds of the $5.2 million letter of credit received by the Trust and the adjusted purchase price of the Hotel in the sum of $5,189,041.10 (purchase price of $5,000,000 plus 10% increase amounting to $189,041.01)). Accordingly, plaintiffs are entitled to recover this $10,958.90 excess payment.

28. Pursuant to § 17 of the Agreement, the Buyer was entitled to a credit against the purchase price "in the amount of the unpaid balance due to Martin Elevator for installation of an elevator recall system." Plaintiffs claim they are due a credit for payment to Martin Elevator on May 26, 1989 of $27,549.63 pursuant to a Martin Elevator invoice dated February 20, 1989 for "installation of fire service as per our 5/14/86 quotation." While it is true that the invoice does not refer specifically to a "recall system," defendant does not deny that an elevator recall system was installed or contend that some additional work was covered by the invoice in question. Accordingly, plaintiffs are entitled to recover from defendant their $27,549.63 payment to Martin Elevator.

## CONCLUSIONS OF LAW AND DISCUSSION

1. The gravamen of plaintiffs' claim concerning the definition of "Net Profits" in § 2 of the Amendment is that the definition is ambiguous and parol evidence establishes that Goldman intended to *exclude* "disbursements" for accrued expenses antedating the Seller Management Period, commencing on May 16, 1987. Consequently, according to plaintiffs, during the Seller Management Period the Trust improperly disbursed income generated by the Hotel during such Period to pay expenses (approximating $700,000, including $193,445.21 interest on the Bing note) that accrued prior to May 16, 1987 for purchases of goods and services and interest.[1]

---

1. Plaintiffs claim that these pre-May 16, 1987 obligations paid by the Trust during the Seller Management Period comprised the following:

(1) trade creditors, $449,872.63; (2) interest on the $2,000,000.00 Bing note from August 1986, $193,445.21; (3) I.F. Romeo pursuant to con-

2. Defendant, on the other hand, contends that § 2 was never intended, to prescribe any restriction on "disbursements" and that the unambiguous language of the section fully expresses the intent of the parties. Therefore, defendant insists that Hotel expenses accruing prior to May 16, 1987, including interest on the Bing note, was properly disbursed by the Trust from revenues generated by the Hotel during the Seller Management Period.

3. Defendant further posits that in any event, the pre-May 16, 1987 "accounts payable" (bills actually received and due, but unpaid, for goods, supplies and services of tradesmen, as reflected on the balance sheet of the Hotel) aggregated at most $7,696.61.

4. In accordance with the court's Memorandum Opinion and Order of May 16, 1991 regarding defendant's motions *in limine* and for clarification, Judge Cedarbaum's ruling on the admissibility of parol evidence is strictly adhered with. Accordingly, the definition of "Net Profits" in § 2 of the Amendment is regarded as "ambiguous" and in construing § 2 of the Amendment, parol evidence has been considered within the parameters delineated in the May 16th memorandum opinion.

5. The parol evidence adduced by plaintiffs at trial concerning the intent and understanding of Goldman and Burch of § 2 does not support plaintiffs' restrictive interpretation of the term "disbursements." In that regard, plaintiffs rely heavily on Goldman's intent and understanding of the language used, but unfortunately Goldman was not actively involved in the negotiations due to illness and was deceased at the time of trial. Plaintiffs did not adduce any documentary evidence prior to or contemporaneous with the Amendment concerning the accounting methodology contemplated in the calculation of "Net Profits" under § 2 or other documentary evidence substantiating their contentions regarding Goldman's intent in § 2. The plaintiff executors' *"post hoc* rationale" in their briefs concerning what must have been Goldman's understanding and intentions is pure speculation.

6. The purpose of the Amendment was to prevent potential legal problems presented under the Agreement of April 9, 1987 with respect to the sale of liquor in the Hotel prior to Goldman's obtaining a liquor license. Hence, under the Amendment, the Hotel would continue to sell liquor under Burch's license and the ownership and management of the Hotel operations would not pass to Goldman until the extended date of closing, no later than September 30, 1987. The Amendment expressly was an accommodation to Goldman: "[t]he Closing Date is being extended simply to afford Buyer an additional period of time in which to apply for and attempt to obtain such a liquor license" (§ 4). In the Amendment, it was the expressed intent of the parties that during the Seller Management Period, notwithstanding any objections by Goldman, Burch would continue operating the Hotel in the same manner as before such Period.

7. Central to the dispute between the parties concerning the interpretation of the "Net Profits" calculation prescribed by § 2 of the Amendment is the basis of accounting—cash or accrual—that Burch and Goldman intended to employ in accounting for the profitability of the Hotel during the Seller Management Period. Unfortunately, this key aspect of the dispute is scantily addressed by counsel on both sides in their posttrial submissions.

8. Since § 2 of the Amendment is not definitive as to the basis of accounting to be employed in calculating "Net Profits," and is at the core of the principal dispute in this case, parol evidence has been considered in an attempt to glean the intent and understanding of the parties and the context in which the Amendment was entered into. The court concludes that the definition of "Net Profits" in § 2 must be construed in light of the fact that the parties contemplated a *cash basis* accounting methodology, *i.e.,* that "Net Profits" would

tract dated March 23, 1987, $11,171.00; (4) Gibson, Dunn & Crutcher, $4,500.00; (5) "unexplained payment to defendant, $40,402.40; (6)

Galef & Jacobs, Special Counsel to defendant for liquor license matters, $1,035.00.

recognize *all* cash receipts and cash disbursements in the Seller Management Period. (Jan. 23, 1991 Tr. 11, Breger, at 43, emphasis added). Following generally accepted principles of cash basis accounting, there were no "Net Profits" during the Seller Management Period.

9. Fundamentally, in "cash basis" accounting expenses are incurred or recognized in the *accounting period they are paid* irrespective of the period when the goods or services were purchased. *See Fundamental Accounting, Theory and Practice*, 3rd Ed., Tunick and Saxe (1963), p. 194; *Accountant's Handbook*, 4th ed., Rufus Wixon (1963), p. 5.10. "Disadvantages of the cash basis arise principally from the fact that this method affords no means of relating the recorded receipts and disbursements to the period to which they are applicable. As a result, difficulties usually are encountered in the preparation of reliable periodic statements of financial position and of results of operation." *Accountant's Handbook*, p. 5.11. And, as pointed up in *Fundamental Accounting*, p. 195: "It is obvious that the cash basis [accounting method] does not reflect income and expense as correctly as the accrual basis."

10. "The cash basis of accounting does not give a good picture of profitability." *Accounting, The Basis for Business Decisions*, 3rd Ed., Meigs, Mosich and Johnson (1972), p. 90. Further,

> [t]o be meaningful, net income must relate to a specified period of time. Since net income is determined by offsetting expenses against revenues, both expenses and revenues used in the calculation *must relate to the same time period.* This matching or offsetting of related revenues and expenses gives a realistic picture of the profit performance of the business each period. *The accrual*

*basis is thus essential to income determination * * *.*

*Id.*, at 90 (emphasis added).

▇ 11. It is apparent from the foregoing that an accrual basis is the accounting methodology of choice in determining the profitability of an enterprise in a discrete accounting period. Therefore, absent any explicit expression of their choice of accounting in their definition of "Net Profits," extrinsic evidence that Goldman and Burch intended accrual basis accounting at the Hotel during the Seller Management Period is critical to sustaining plaintiffs' interpretation of § 2. The court finds, however, that in connection with the Amendment, Burch specifically discussed with Breger using cash basis rather than accrual accounting (Tr. Breger, at 43).[2] In ascertaining the intent and understanding of the parties, Breger's discussions with Burch are of relevance in light of the fact Goldman was seriously ill in 1987 and Breger had substantial responsibility for negotiating the contracts. These circumstances must be kept uppermost in mind regarding "Goldman's intent." There is no credible evidence that prior to or contemporaneously with the execution of the Amendment, either Breger or Goldman ever conveyed their intent to Burch that accrual basis accounting should be used for purposes of § 2, or either Goldman or Breger objected to Burch's intention to use cash basis accounting. Burch's calculation of "Net Profits" was made in good faith and followed generally accepted principles of cash basis accounting.

▇ 12. Under cash basis accounting, "Net Profits" as defined in § 2, properly recognized all expenses of the Hotel *paid* during the Seller Management Period whether accrued prior to or during such period. This interpretation is consistent with the unqualified term "disbursements"

2. The transcript shows the following testimony by Breger on direct examination:

"Q. Was there any discussion concerning the manner of accounting that Mr. Burch would employ [during the Seller Management Period] in reporting the results to his management? * * *

A. It was the accounting for all of the receipts and disbursements [that] would be set forth in the period from May 15 until the closing date of September 30.

Q. Was there any discussion with respect to the manner of accounting to be employed; that is, on [a] cash basis or on an accrual basis?

A. *On a cash basis.*" (Emphasis added.)

in § 2, such connotations of cash basis accounting in § 2 as "cash receipts" and "cash disbursements" and Burch's uncontradicted testimony that he intended to pay the accrued expenses out of Hotel revenues as an inducement or consideration to the Trust for extension of Seller management and the closing date from May 7, 1987 up to September 30, 1987. "If the intent of the parties can be ascertained, it should be followed, for it would be unjust in such a case to impose theoretically preferable accounting practices upon the parties." 51 *Columbia Law Review* 867, 876 (1951).

13. Where the parties intended to restrict or cap disbursements under § 2, they knew how to do so and expressed their intent specifically: (1) "Net Profits" were not to be reduced by *expenses relating to the purchase of alcoholic beverage inventory* for the Hotel to the extent that such expenses were paid out of cash receipts from the sale of alcoholic beverages (Amendment, § 2, emphasis added); (2) management fees paid by the Hotel to B & B were limited *"to amounts necessary to pay out of pocket expenses incurred by B & B* (Amendment, § 2, emphasis added); and (3) advancements of working capital by Goldman could be expended by the Hotel only "to pay for *current and anticipated* disbursements, including without limitation, all *capital expenditures to be paid after the First Closing"* (Amendment, § 7(d)) (emphasis added). Significantly, other than the foregoing limitations and qualifications, the Amendment makes no reference whatever to any limitation on disbursements in calculating "Net Profits."

14. While under § 6.02(1)(iv) of the Agreement neither party was *obligated* to agree to any less advantageous alternate arrangement than that described in the Agreement, neither party was precluded, if he was willing, from agreeing on a less advantageous alternate arrangement. Accordingly, plaintiffs' contention that the Amendment cannot be construed in any fashion that was economically less advantageous to Goldman than the Agreement is without merit.

15. Because the Hotel (on a cash basis) operated at a deficit during the Seller Management Period, the Trust was not obligated to pay any rent to Goldman under the Building Lease (deft's exh. B, § 7(c)(ii)).

16. Under § 5.01(c) of the Agreement, real estate taxes for 1987 were to be apportioned between the Trust and Goldman as of the day next preceding the closing date. Accordingly, the Trust was responsible for real estate taxes accrued up to that date regardless of when the tax was actually assessed by the City or the bill received. Following the closing, pursuant to a Notice of Determination of the New York City Department of Finance dated April 20, 1989, Goldman's estate was required to pay a tax deficiency in the sum of $21,146.14 (including principal and interest) for tax periods prior to the closing (*viz.*, March 1, 1986 through September 30, 1987). Consequently, plaintiffs are entitled to recover from defendant their postclosing payment of $21,146.14 for the real estate tax deficiency for the pre-closing periods mentioned above.

17. In compliance with § 17 of the Agreement, the Trust was to pay Goldman one-half the cost of "installing a [fire alarm] system to comply with the balance of Local Law 5." Goldman paid the sum of $141,060 to O'Donoghue Contracting Corp. ("O'Donoghue") for work done at the Hotel and claims entitlement to a reimbursement from defendant in the sum of one-half: $70,530. The fire system work was performed under Local Law 16, which applies to hotels, rather than Local Law 5, which applies to identical work in buildings other than hotels. Hence, both parties were mistaken in the numerical citation to the applicable Local Law for hotels, but agreed on the work for which Goldman was to receive payment of one-half the cost. Construing the Agreement as applying only to work done at the Hotel under Local Law 5, as urged by defendant, would require the court to find that the parties agreed to a nullity, since Local Law 5 did not apply to Hotels. Fundamentally, construction of contract provisions resulting in the parties' agreement to nullities or absurdities is to be avoided, if possible. Local Law 5 of the

City of New York, which applies to public buildings other than hotels, calls for substantially the same type of fire systems as Local Law 16, which applies to hotels. The parties' clear intent as to nature of the installation rather than their patently erroneous reference to Local Law 5 is controlling. Accordingly, plaintiffs are entitled to recover for one-half the cost of the work: $70,530.

■ 18. The Amendment, § 7, provides that Seller had "the right to withdraw and retain an amount equal to the amount of Accounts Receivable existing as of the First Closing, as and when such Accounts Receivable are collected." Importantly, the section goes on to provide: *"if the Seller has not received the entire amount due it from cash flow by the Management Transfer Date, Buyer shall be obligated to reimburse to Seller the balance promptly following the Management Transfer Date"* (emphasis added). Burch claims that Goldman owes the Trust $50,774.86 for accounts receivable that existed as of May 15, 1987, but remained uncollected by the Trust as of the Management Transfer Date. Plaintiffs argue that since such accounts receivable were never collected by Goldman or plaintiffs, they have no obligation to reimburse the Trust for accounts receivable. Plaintiffs' contention misconstrues the obligation that Goldman assumed under § 7: an unconditional obligation to reimburse the Trust for uncollected accounts receivable *"promptly following the Management Transfer Date"* (emphasis added). Plainly, Goldman's obligation of reimbursement promptly following the Management Transfer Date cannot be fairly construed as contingent on Goldman's collection of the outstanding accounts receivable. Consequently, whether or not anytime after closing Goldman ever collected such accounts receivable was solely Goldman's problem. Accordingly, under Amendment § 7, the Trust is entitled to recover of plaintiffs the sum of $50,774.86 for accounts receivable.

19. The Agreement, § 5.01, and Amendment §§ 5(f) and 6(d) provide that certain items, including real estate taxes, must be apportioned or prorated as of the day next preceding the date of closing. The apportionment provision in § 5.01 clearly contemplated that prior to closing, the seller would be prepaying certain expenses or charges and receiving various fees, deposits, rents or income that would carry over after closing. Burch maintains that Goldman owes the Trust $254,632.31 for various expenses that were apportionable or proratable in accordance with § 5.01, including $171,423.96 for real estate taxes paid by the Trust through December 31, 1987 (plft's exh. 5). Plaintiffs claim that the items for which Burch seeks credit pursuant to § 5.01 are not (with certain exceptions referred to *infra*) subject to proration for the reason they were paid out of Hotel revenues during the Seller Management Period.

20. The question arises as to whether the parties intended that Burch should receive both apportionment credits in conformance with § 5.01 of the Agreement and a reduction of "Net Profits" for expenses paid out of Hotel revenues during the Seller Management Period under § 2 of the Amendment. The court must respond in the negative.

■ 21. Under § 5.01 of the Agreement, prepaid expenses by the seller prior to closing and carrying over after closing to the benefit of the buyer were subject to proration or adjustment in favor of the seller at or following the closing. At the time when the Agreement was executed, however, there was no "Seller Management Period" or reduction of the purchase price by the "Net Profits," as provided in § 2 of the Amendment. The Agreement and Amendment must now be read together as a whole to properly glean the intent of the parties on the issue presented. A rational construction of § 5.01 of the Agreement in light of the later provisions of § 2 of the Amendment leads the court to conclude that Burch and Goldman never intended *both* a reduction of "Net Profits" resulting from payment of expenses out of Hotel revenues *and* an apportionment of such expenses resulting in a positive adjustment in favor of the seller. Therefore, defen-

**790**

dant's requested apportionments are rejected.

## CONCLUSION

A careful review of the provisions of the Agreement and Amendment in light of the evidence adduced at trial leads the court to the inescapable conclusion that the purchase of the Dorset Hotel operations was an onerous undertaking by Goldman, economically and legally. Although Goldman was a highly sophisticated businessman and was represented at the contract negotiation stage by veteran counsel, the court recognizes plaintiffs' belief that there was some overreaching by defendant in his dealings with Goldman. Also recognized is Burch's feeling that he was extremely accommodative in entering into the Amendment considering Goldman's delay in closing because of his liquor license problem.

■ In the final analysis: defendant had a fiduciary obligation to his Trust to make the best deal possible; predicated on what the court regards as the most credible evidence of record concerning the intention and understanding of the parties under § 2 of the Amendment, cash basis accounting for "Net Profits" under § 2 is consistent with defendant's contentions, and adverse to those of plaintiffs; plaintiffs' parol evidence on the issue of Goldman's intent under § 2 was not credible; and the court is not at liberty in this case to reform or rewrite the contracts in the manner urged by plaintiffs.

Predicated on the foregoing findings and conclusions, plaintiffs have established by a preponderance of the evidence the following claims aggregating the sum of $130,184.67:

$10,958.90 excess payment concededly received by defendant under the letter of credit;

$70,530 for one-half of the Local Law 16 work;

$27,549.63 Martin Elevator bill; and

$21,146.14 real estate tax deficiency.

Defendant has established by a preponderance of the evidence the following counterclaims aggregating the sum of $200,972.59:

$17,810 for refunds plaintiffs concede is owing to defendant;

$50,774.86 for reimbursement for accounts receivable; and

$132,387.73 for balance owing on working capital advance plus interest.

Accordingly, defendant is entitled to a judgment on his counterclaims in the net amount of $70,787.92 plus prejudgment interest at the rate of 9 per cent per annum from September 30, 1987 pursuant to N.Y.C.P.L.R. §§ 5001, 5002, and 5004. Postjudgment interest shall be calculated in accordance with 28 U.S.C. § 1961.

Both sides claim entitlement as the "prevailing party" in this case to an award of counsel fees and costs pursuant to § 14(e) of the Agreement. As both plaintiffs and defendant have "prevailed" in part, the parties shall pay their own counsel fees, costs and expenses.

The Clerk of the Court is directed to enter judgment for defendant in the net amount of $70,787.92 plus interest in accordance with Fed.R.Civ.P. 58.