Jane H. GOLDMAN and Allan Howard Goldman, as Executors Under the Last Will and Testament of Sol Goldman, Deceased, Plaintiffs,

v.

Robert BURCH, Individually and as Trustee Under Trust Known as GC–1 Trust, Defendant.

No. 87 Civ. 7189 (BN).

United States District Court,
S.D. New York.

Jan. 13, 1992.

Stephen H. Penn & Associates, Noel W. Hauser, New York City, for plaintiffs.

Gibson, Dunn & Crutcher, Mitchell A. Karlan, New York City, for defendant.

## OPINION AND ORDER

NEWMAN, Senior Judge, United States Court of International Trade, sitting as a United States District Court Judge by Designation:

## INTRODUCTION

The parties, asserting various errors in the court's Opinion, Findings of Fact and Conclusions of Law dated November 25, 1991, 778 F.Supp. 781 (1991), and the judgment entered thereon dated November 29, 1991, have cross-moved for relief under Fed.R.Civ.P. 52(b), 59(a) and (e). Additionally, plaintiffs seek a new trial to adduce additional evidence regarding the Trust's claim of a $500,000 cash advance to the Hotel by wire transfer for working capital.

For the reasons that follow, plaintiffs' applications are denied *in toto;* defendant's applications are granted in part.

## DISCUSSION

### I.

Plaintiffs contend that the court erred in holding: "the plaintiff [sic] is [sic] absolutely obligated to pay the defendant an amount equal to the total of accounts receivable in favor of the Hotel as of the Management Transfer Date, *September 30, 1987."* *Affirmation of Noel W. Hauser, dated December 5, 1991, par. 4* (emphasis added). Plaintiffs further argue that the accounts receivable in question for which the court determined plaintiffs had an obligation to reimburse the Trust relate only to the period *after* May 15, 1987, which accounts according to plaintiff belonged to Goldman under § 7(a) of the Amendment.

Finally, plaintiffs claim that the court's award to defendant of $50,774.86 for accounts receivable is unsupported by the record. Accordingly, plaintiffs request that the court subtract $50,774.86 from the sum awarded to the Trust. The request is denied.

■ Counsel for plaintiffs has misread the court's opinion. The court did not hold that plaintiffs are liable to the Trust for accounts receivable as of the *Management Transfer Date, September 30, 1987.* Rather, the court determined that pursuant to § 7(a) of the Amendment, after the Management Transfer Date (*viz.,* September 30, 1987) Goldman was obligated to reimburse the Trust $50,774.86 for the uncollected balance of accounts receivable *that existed as of the First Closing, May 15, 1987.* Plaintiffs concede that after the Management Transfer Date the Trust was entitled to the uncollected balance of accounts receivable existing as of the First Closing—May 15, 1987.

Burch's credible and uncontradicted testimony (Burch, Tr. 106) and the figures shown in plaintiffs' exhibits 5 and 6 (based on the books and records of the Hotel) establish that the accounts receivable as of the First Closing (May 15, 1987) amounted to $850,623.55 and that by the Management Transfer Date (September 30, 1987) the Trust had withdrawn $799,848.69 from the Hotel during the Seller Management Period, leaving a balance due the Trust for uncollected accounts receivable of $50,-774.86. Consequently, the court adheres to its prior award to the Trust of the balance of accounts receivable that existed as of May 15, 1987, to which the Trust was entitled under § 7.

## II.

Plaintiffs persist in their challenge to the Trust's right pursuant to the Amendment to use revenues generated by the Hotel during the Seller Management Period to pay bills received during such period for expenses incurred prior to that period. In further support of their position, plaintiffs have annexed an affidavit dated December 5, 1991 executed by Paul Underhill, Gold-man's representative at the Hotel during the Seller Management Period. Ostensibly, the affidavit calls to the court's attention controlling new facts.

■ According to Underhill's affidavit, a substantial percentage of the Hotel's sales of food, lodging, and other services were credit card transactions and other accounts receivable rather than cash receipts. Plaintiffs maintain that since under § 7(a) accounts receivable generated by the Trust after the First Closing for sales during the Seller Management Period belonged to Goldman, Burch had no right to pay pre-Seller Management Period expenses out of Hotel revenues, thus reducing "Net Profits" as defined in § 2.

■ Plaintiffs' argument ignores the fact that under § 7(a), only those accounts receivable relating to the period after May 15, 1987 *"which are on hand at closing"* (emphasis added) belonged to Goldman (Burch, Tr. 93–4). That stipulation is clearly indicative of the Trust's right to use *cash receipts* during the Seller Management Period for Hotel operations. Regardless of what percentage of the Hotel's revenues were derived from credit card sales and thus were initially on the Hotel's books as accounts receivable, after receipt of funds from the banks for credit card sales during the Seller Management Period, the accounts receivable became "cash receipts" and obviously were not accounts receivable "on hand at closing." After receipt by the Hotel of cash payments from the accounts receivable debtors during the Seller Management Period, such cash receipts were properly used by the Trust for payment of its bills received in the normal course of business during the Seller Management Period, *including bills resulting from pre-seller Management Period expenses.* Such cash disbursements reduced Seller Management Period "Net Profits" in accordance with § 2 of the Amendment and with principles of cash basis accounting.

■ Thus, even accepting the facts recited in the Underhill affidavit, the court adheres to its previous ruling that the Hotel's

"cash receipts" during the Seller Management Period (whether or not derived initially from accounts receivable) were available to the Trust for payment of all bills received in the ordinary course of business, whether for expenses accruing before or on and after May 16, 1987. All cash receipts and disbursements during the Seller Management Period were factors in the computation of "Net Profits" in accordance with the definition thereof in § 2 and in accordance with generally accepted principles of cash basis accounting. Conversely, under § 7(a), any Seller Management Period accounts receivable *still on hand at closing* (*viz.*, uncollected receivables) belonged to Goldman, and since accounts receivable were neither cash receipts nor cash disbursements, they were not relevant to the calculation of "Net Profits" under § 2 or under cash basis accounting principles.

As was stressed in the original opinion, a critical issue in the determination of the "net profits" of a business within a certain time-frame is the method of accounting agreed upon by the parties. Inexplicably, in the case of the Amendment, which obviously received close scrutiny by counsel for Burch and Goldman, there is no definitive agreement regarding the accounting method for the determination of "Net Profits."

■ Arguably, the "bare bones" definition of "Net Profits" in § 2 of the Amendment—in essence, cash receipts less cash disbursements—strongly suggests that cash basis accounting was intended by the parties to the Amendment, but the definition is not explicit in that regard. On the basis that the definition of "Net Profits" in the Amendment was ambiguous, plaintiffs sought, successfully, rulings, initially from Judge Cedarbaum and after reassignment of this case, from the writer, avoiding the strictures of the Parol Evidence Rule. Thus, at trial, the parties were permitted to establish the intent of Goldman (who was deceased at the time of trial) and Burch by the context in which the term was used, the situation of the parties and the surrounding circumstances pertaining to the Amendment.

As pointed up in the original opinion concerning accounting methodology, counsel for plaintiffs questioned his witness Breger at trial specifically concerning the method of accounting he had discussed with Burch—cash basis or accrual basis—and attorney Breger (who negotiated and reviewed the Amendment on behalf of Goldman) testified unequivocally on direct examination that the method he discussed was "on a cash basis" (Breger, Tr. 43).

Plaintiffs now disingenuously attempt, in a back-handed fashion, to impeach the testimony of Breger, a veteran business lawyer, on his understanding of the distinction between cash basis and accrual accounting. Plaintiffs have not even submitted an affidavit by Breger supporting their bald allegation that his understanding of cash basis accounting differed from the fundamental accounting sense.

There is no suggestion in the record that in determining the "net profits" of a Hotel, the terms "cash basis" and "accrual basis" accounting have a special meaning in the Uniform System of Hotel Accounting that differs from generally accepted accounting principles. Moreover, the authoritativeness of the "Uniform System" as an accounting "bible" for the hotel industry is largely emasculated by the fact that "nobody completely abides by it" (Coords, Tr. 232).

### III.

■ Plaintiffs contend that the court's finding of a $500,000 working capital advance by the Trust is "not supported by anything of record" and therefore is "clearly erroneous" (plffs' motion, par. 18). Such contention is frivolous since it ignores the uncontradicted and credible testimony of Burch *corroborated by that of Leyco, the Hotel's assistant controller,* showing the advance was transferred by wire to the Hotel's bank, Manufacturers Hanover.[1]

---

1. Plaintiffs' own witness, Leyco, testified:
   Q. [Y]ou know, do you not, from our own personal knowledge that Mr Burch during September, 1987 did in fact contribute $500,000 working capital to the Hotel Dorset business, correct?
   A. $500,000 was bank wired sometime in September 1987, yes. Leyco, Tr. 69.

*See* Burch, Tr. 104–107, 156, 162; Leyco, Tr. 13, 53–55, 67, 69–70; Coords, Tr. 202, 204, 217–18, 236, 243–44; plfts' exh. 5 ("Working Capital") and 6 ($150,000 "net advances by seller"), 24, 25; and deft's exh. 5.

The Amendment contemplated that Burch could make a working capital advance if Goldman failed to do so and that such advance by the Trust would be reimbursed with interest (deft's exh. B, § 7(d); Burch, Tr. 63–64, 95. Understandably, if the advance was transferred by wire directly to the Hotel's bank, the advance might not appear in the Hotel's cash schedule or other records of cash receipts, including cash received shown on the daily reports. Of course, defendant's unexplained failure to produce documentary evidence from the Hotel's bank establishing the wire transfer bears on the weight and credibility of the testimonial and other evidence submitted by defendant. Nonetheless, the court concludes that on the issue of the working capital advance by the Trust, Burch's *corroborated* testimony was sufficient to make a finding in favor of the Trust. Reopening the case for additional evidence on the working capital issue, as requested by plaintiffs, is entirely unwarranted.

### IV.

■ In the original opinion, 778 F.Supp. at 789, the court determined that when the Agreement providing for the prorations was executed, the parties did not contemplate a Seller Management Period or reduction in purchase price by "Net Profits," as thereafter provided for in § 2 of the Amendment. Hence, the court concluded that under the Amendment, the parties did not intend that the Trust should receive both apportionment credits in conformity with § 5.01 of the Agreement and a reduction of "Net Profits" for expenses paid out of Hotel revenues during the Seller Management Period under § 2.

Defendant now urges, and the court is constrained to agree, that the parties had precisely apportionment of the § 5.01 expenses in mind when they *reiterated* in §§ 5(e) and 6(d) of the Amendment that there be prorations *as provided in § 5.01*— ostensibly following the parties' understanding that during the Seller Management Period, the Hotel and its revenues still belonged to the Trust, not Goldman. Accordingly, the Trust maintains that it should recover the sum of $254,632.31 for the § 5.01 prorations and adjustment of expenses that were paid by the Trust out of Seller Management Period revenues and benefitted Goldman after September 30, 1987.

In the Amendment, Burch and Goldman agreed explicitly, unqualifiedly and unconditionally on prorations and adjustments under § 5.01, without excepting expenses paid by the Trust out of Hotel revenues during the Seller Management Period. "A court may not rewrite into a contract conditions the parties did not insert or, under the guise of interpretation, add or excise terms ..." *Marine Associates v. New Suffolk Development Corp.*, 125 A.D.2d 649, 510 N.Y.S.2d 175, 178 (2d Dept.1986).

In view of the foregoing considerations, the court modifies its former determination regarding the prorations under § 5.01 and now, awards the Trust an additional $254,-632.31 to be added to the net amount of the judgment previously awarded to the Trust on its counterlaims—$70,787.92 plus prejudgment interest.

### V.

■ Defendant asserts that the court erroneously denied it an award of its counsel fees in accordance with § 14(e) the Agreement as the "prevailing party," citing *Roberts v. Madigan*, 921 F.2d 1047, 1058 (10th Cir.1990); *Studiengesellschaft Kohle v. Eastman Kodak*, 713 F.2d 128, 131 (5th Cir.1983); *Solow v. Wellner*, 150 Misc.2d 642, 569 N.Y.S.2d 882, 888 (Civ.Ct.1991). *See also* 10 Wright, Miller & Kane, *Federal Practice and Procedure* § 2667, p. 191 (1983) ("a successful counterclaimant generally will be considered the prevailing party when plaintiff fails to recover or is awarded less than defendant receives on

the counterclaim"). On reconsideration of defendant's request for counsel fees, the court concludes on the basis of the authorities called to its attention that since defendant has overwhelmingly succeeded under its counterclaims and to a substantially greater extent than did plaintiffs on their complaint, *the Trust* is entitled to be awarded its reasonable counsel fees.

## VI.

■ Defendant Burch in his *individual capacity* also requests an award of attorney's fees inasmuch as his motion for summary judgment of dismissal was granted by Judge Cedarbaum. Although Judge Cedarbaum found that there was no justification for suing Burch individually and such suit was frivolous (March 23, 1990 transcript, p. 21–22), unfortunately Burch's request (in his individual capacity) for counsel fees as the "prevailing party" must be denied. Burch in his *individual capacity* although a party to this lawsuit was not a party to the *Agreement,* which is a contractual predicate for a fee-shifting award of counsel fees to the "prevailing party." However, since an award of costs to the prevailing party is provided by Fed. R.Civ.P. 54(d), Burch is awarded costs in both his individual capacity and capacity as Trustee.

## VII.

■ The court does not concur with defendant's argument, previously addressed in the original opinion, that because § 17 of the Agreement refers to Local Law 5, the Trust was not obligated to reimburse Goldman for installing a fire system in compliance with Local Law 16. It was previously mentioned that Local Law 5 applies to buildings other than Hotels. The court may readily infer from the context of the provision that both parties intended the inept reference to "the balance of Local Law 5" (Agreement, § 17, emphasis added) as merely a short-hand description for *additional fire alarm system work in the Hotel required by the New York City fire code.*

Since Local Law 5 applies to fire protection systems, but in buildings other than hotels, defendant's literal reading of the contract to refer to reimbursement to Goldman for only work under Local Law 5 simply ignores the substance of their agreement and attempts to take advantage of an error in citing the applicable Local Law. Defendant's argument results in ascribing to the parties an intent to provide a meaningless and ineffectual—indeed absurd—agreement regarding reimbursement to Goldman for fire alarm system work. Fundamentally, a literal reading of contract language should be eschewed by the court where such interpretation makes the provision in question absurd or meaningless, and the substance of parties' agreement may be gleaned and effectuated consistently with their obvious intent. Accordingly, the court adheres to original findings and conclusions.

## VIII.

■ Finally, plaintiffs contend that defendant's cross-motion, filed on December 13, 1991 is untimely under Fed.R.Civ.P. 52(b) since it was not made within the ten days after the entry of judgment permitted by the rule, and that the ten day period may not be extended by the court under Fed.R.Civ.P. 6(b). Defendant, however, has not requested an extension of time under Rule 6(b) and maintains, correctly, that its cross-motion filed on December 13, 1991 was made within ten *business* days after entry of judgment on November 29, 1991, and is therefore timely under Fed. R.Civ.P. 6(a).

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED:

1. The judgment entered on November 29, 1991 is hereby vacated and the Findings of Fact and Conclusions of Law as set forth in the opinion of November 25, 1991 are modified to the extent indicated *supra.*

2. Within thirty (30) days of the entry of this order the Trust shall file in this court and serve plaintiffs with an application for an award of counsel fees with

supporting documentation. Plaintiffs may respond to such application within twenty (20) days after service of the application; defendant may thereafter file and serve a reply within five (5) days after service of plaintiffs' response.